Good morning, Your Honors. My name is Chris Sargent and I'm here representing Palomare LLP Corporation. I'd like to reserve at least five minutes for rebuttal, please. In the six days since an appeal for a summary judgment ruling by the Bankruptcy Court and a firm by the U.S. District Court, finding that a statute of limitations on legal malpractice had lapsed prior to the signing of the tolling agreement and occurred less than one year after the appeal, LLP here had actually stopped providing legal services in the form of corporate and transactional advice. For Heller's provision of substantive legal services after the critical date here, which was July 11, 2007, both in the litigation, the duty and the support of governance, precludes the granting of a summary judgment in this suit. And then, before I just tear away at it, so post-July 11, 2007, what's the most significant provision of legal advice you've seen since your time in the firm with Heller LLP? Well, there's the two different ways that Heller Ehrman was representing Paravue. There was the litigation acuity and then there was the general corporate representation that went back to their inception with the corporation. In the litigation alone, on July 13th, Heller Ehrman appeared in court and sat at their superior court, representing Paravue. Wait, was that with Jerome Taylor? Please let us know how that was met. No, that was actually on a motion for preliminary adjudication program, I believe. I'm sorry, I've already moved you off the point. At the end, given notice of the next Part A request to withdraw, but that hearing had continued from July 12th to July 17th through July 11th. So, they appeared at that hearing. After that hearing, Heller Ehrman prepared the proposed order on a temporary restraining order, not a preliminary injunction, and negotiated that and sought and required approval of that proposed order from the incoming counsel for Paravue, who had not yet substituted Mr. Ackerman, as well as the counsel for Acute and Mr. McLeod. And then they wrote a letter and submitted that letter procedurally beginning on July 19th, which was after the substitution had been done. So, do we look at the negotiation time, I guess, negotiation time of terminating or the course of acceleration of termination? Or do we look at the time of the intent to terminate? The test under the CCP or California Code of Civil Procedure 248.6 is undue representation. How long does representation continue for, actual representation for? So, the intent... So, again, it doesn't ask for representation to continue, but the representative term is free, allowed. Representation absolutely can continue after there's multiple decisions in the California Court of Appeal that are found. So, we were lucky to have the Gerkowitz decision, where after they had provided notice of withdrawal, they then worked on a memorandum of costs on appeal. They negotiated that with opposing counsel, and then that was submitted. And then there was a second notice of determination for representation that took place. And the court there, the Court of Appeal, found that the fact that there was an earlier notice of termination didn't matter when there was subsequent legal services that had actually been provided. Well, what do you say about the earlier determinations? Do you think those were actual notices that should be given validity? In the Gerkowitz case, the lawyer sends a letter saying our representation has ended. I mean, in this case, that was the same, I believe, by Mr. Hawke, I think, who was saying that we intend to withdraw at least until next week. Well, one of the interesting things about Mr. Hawke's email, he doesn't actually say that the court will not provide legal services anymore. What he provides is notice of an ex parte application of his intent to seek a withdrawal from representation in the litigation. Counsel, it's just cool if I could interject just to clarify. In my mind, it is your position that the representation continues until the court decides in order that states that the representation is over. The California courts have been clear that there's no right on the test, Your Honor. So the court signing the order of withdrawal is in of itself not necessarily the end of the representation. So does that mean we couldn't give your client a partial summary judgment in effect and a because of fact issue to the trial court? I believe that's correct, Your Honor, yes. There's an issue about exactly which is the California courts talked about this being an issue of fact that is normally not decided on summary judgment unless it's very clear that you have a strong set of undisputed facts. Here, I believe there are actually undisputed facts of acts of representation by a pair of you after the critical date. The period of the hearing I just mentioned in the litigation, the preparation and negotiation of the order are all classical kinds of activities that the California courts have found sufficient to find a continuing representation. There's also representations that continue to occur on the corporate and transactional side of this relationship after the critical date of July 11th. It appears though that there's a non-judgmental use of bearer support. It's simply said there were a series of emails, I think, around the 3rd to the 7th of July that could be officially concluded. It would seem a little bit amazing to have emails declaring this relationship. Well, no, it isn't. That would be a little bit of a spoof. First, the fact that they continue to exercise legal services means that whatever the parties themselves may have believed at the time, it doesn't matter what matters. It is whether or not services continue, legal services, substantive legal services continue to be provided after the critical date. The other problem with the lower court's ruling is that the documents that Judge Montale was looking at with respect to that time period between July 3rd and something even up to July 10th were with respect to Dr. Barghout in her individual capacity. And I would submit that he was improperly constating Dr. Barghout, who was at that time a member of the board, CSO, and at the beginning, individually against security, with Peter Barghout. I don't think the court needs to even get there in this particular case because of the substantial litigation activities that took place up to the critical date. What about on the corporate side, folks? So on the corporate side, you have the emails used to bow where he's working on the get-up table, and this has actually been raised as an issue by Dr. Barghout in an email prior to that time where he's just in scarcity of power. He's litigation counsel. Hey, the county's executing tables, a problem in this case, and this is in the record here. And then he was just out emails, just in the cloud, and he was doing a screening actually for ACUITY. So it's a little, the context is a little odd, but it does show that he was providing corporate services on what was a pretty important issue in the county. The core, while the court disputes in the ACUITY litigation was corporate control, and the capitalization of the loans and what she personally shares is a huge issue for ACUITY as a result. I'm not sure if that matters, because I know you're eyeing on the litigation side, but does that aspect of the corporate representation, is that a key part of the litigation? Before you point to ACUITY, it has to be specifically, you know, the same specific, but I mean, you know what I'm saying? It's the same subject. Yeah, yeah. ACUITY side, I mean, with respect to ICAW, it sounds different from the whole loan. So that's what you heard. That's correct. There is some distance between specifics of the cap table and the overall disputes that were going on between Heller, which was ACUITY, and ACUITY regarding the notes and the failures that Heller, Irwin had with respect to the creation of those documents, as well as the activities that took place with the litigation. However, had Heller, Irwin provided an accurate cap table at the beginning of all of those disputes, it would have simplified them and didn't. There were a lot of movements in the ACUITY litigation around whether or not Dr. Barnett could exercise the rights as a shareholder, for example. And there was a dispute about what percentage of shares that she had. So if there was an accurate cap table, I think that would have had an interaction with those litigation organs. Do you expect a status or anything else on the corporate side of the dispute? There's also the preparation of the advice that was given with respect to the transition when Mr. Barnett left on July 9th and 10th, and the process of Dr. Barnett becoming CEO as of July 13th. There was a corporate resolution prepared that lines up with the typical stylings of Heller, Irwin resolutions that had been prepared previously. And Dr. Barnett sent in a declaration that Heller, Irwin had agreed that they would help to make sure a shareholder meeting would take place after July 10th. What about the appeals that was held? Was the appeal... Yes, the appeal. What was that about? What did they say about that? The appeals from one of the preliminary tribunals, which I'm not sure which of them it was. There were actually two in the Santa Clara Superior Court litigation. And there's an email in the record where after July 19th even, where again, Heller, Irwin is discussing the process of withdrawing from the court of birth or death's counsel record and whether or not to seek a substitution from Mr. Axe. That didn't occur until July 24th, that substitution. I'm just wondering, can I ask you if you're... I'm going to pause so that you didn't interrupt me, if you had a thought. But there is an email of the data, which I can't remember, in which it was after, I think, Heller said he wanted to get out. It would be even after the motion was drawn. That doesn't occur to me. I can't remember the sentence. Sorry. But they basically say, look. We need an accounting of every dollar we owe the patient. And it's not exactly we want to know how much you're going to give us back. And that communication didn't seem to be the best on the client side. You see, even paramedics didn't pick up this relationship. This is ongoing. Everyone's just kind of dying down the road, right? Well, the email that you're referring to, it was actually sent by Dr. Barkey's personal counsel. And I think that there's another potential issue of conflation there, that the lower courts inferred into that email that Dr. Barkey's personal counsel was acting for paraview. There's no evidence in the record outside of that one email that he ever had any representation in a relationship with paraview. In fact, all of the other documents and records show that he was counsel for Dr. Barkey, personally alone, representing her interests as the majority shareholder in paraview. And that email did not – there's a phrasing. It was about a dispute also, wasn't it? It went back to a dispute between one of the companies, the CEO, I guess, at the time. Mr. Fenton? Yeah. He said, he said to himself, he said, he said, withdraw or resign. And he says to Mr. Fenton, is that right? And so he says, well, yeah, you resigned. I've sent you a resignation. He says, no, I didn't resign. He says, really, hiring a personal counsel to contest her status with paraview. Yeah, that's right, Your Honor. It was beginning of all of the litigation right before all the litigation started. There was a dispute about whether or not Dr. Barkey was assigned as a CSO, not CEO, per se. Mr. Fenton can support the interest to be a quasi-representative for the – for paraview? No, Your Honor. He was representing Dr. Barkey's interests as a shareholder in paraview. So to the extent that he encouraged this as a shareholder or a line of the corporation, yes, there would have been arguments made that would have been a benefit to paraview the corporation. But he was never counseled for paraview the entity. And it's demonstrated by the history of the substitutions here. There's no temporary period where Dr. Barkey's counsel was representing CEO and straight from hell or heaven to Mr. Ackerman. Counsel Judge Gould, if I can interject, would you like to save a little time for – Well, because it says one judge here. I would appreciate hearing your perspectives in a short form after your opponent has stated their first-hand, your position. I would like that very much, Your Honor. Okay, very good. We'll hear from your opponent and I'll be back up. Thank you, Your Honors. May it please the Court, my name is Marjorie Manning, and I represent the appellee in hell or heaven in this matter. First of all, to address Judge Gould's question, I do not believe that there is a single disputed material fact in this case. What there is is a very heated dispute over the legal effect of the undisputed facts. Your Honor, you're saying that there are no disputed facts about whether the e-mails that were sent out by the papers suggest that they have been in to the representation? And the reason I ask you this is because one of the e-mails was from Mr. Hall, and he said, I would stand that if a jury does not make this judgment, in the near term, dismiss therapy from the penance, and a clerical could have action, I expect that Helen Berman would seek to withdraw his counsel, and that action possibly as early as this next week. And then it goes on to say that she believes that she has a legal basis that she should request another counsel. So what I'm saying is, words like if, near term, expect, will seek, and possibly have those determinative words, but it helps to say that there's a definite end to a relationship towards counsel. I believe those are two different e-mails. If this is one of them. There is an e-mail that says, you should know that if a jury does not dismiss Helen from this litigation, we may well move to withdraw as early as next week. There is a subsequent e-mail, in fact, there are two subsequent e-mails, giving at least two, if not three, giving notice of withdrawal, intent to withdraw, and there are at least two e-mails. Who's getting the one you're talking about? Who were those sent to? They were sent to Lord Barkhout and Mr. Russo. And was he his personal attorney? He was initially. And he was obviously dealing with the cabinet, right? He was initially her personal attorney, but then he took on the mantle of demanding that certain actions be taken on behalf of her. And by July 9, 2011, he, at the same date, resigned the same day, or the day before Lord Barkhout appointed herself CEO. So he actually filed, on behalf of her, an application for TRO and preliminary injunction to stay the activities scheduled for closure sale. So he, Mr. Russo, Mr. Russo became more and more and more and more involved as time went on. Now, I understand what you're saying, but what does that mean? Of course, the fact is, what is the relationship? What is his role? What is his authority? Who is acting on behalf of the corporation? That's what my question is. I'll argue that there's an indication that there's a determination, an undesired determination, but is that a part of who it goes to, what it says, and the authority? How is it that they put an undisputed sign? That's what I'm getting at. Isn't that really impossible to say what all this means? There really is no question of fact as to what the emails say, whether they were sent, whether they were delivered, who they were copied to. There is none. And the only question is, what is the effect of that under prevailing California law? Which is application of undisputed facts to legal principles, which is the very essence of summary judgment, of course. So what I'm saying is, we might withdraw as early next week. We are withdrawing. I'm telling Keller what to do as Ms. Barkow's so-called personal counsel became a demand that she take these actions on behalf of the peer review. And when Keller refused again and again in writing, Mr. Russo filed the document himself. So you can't very well say, gee, I really wasn't representing peer review. But all Keller was. Mr. Russo doesn't decide on his own. You allowed him to represent peer review, does he? The point is, just to say as an introduction to this, all of those events that I'm talking about, every single one of them happened no later than they were over by July 10th. So they are, they render the client time barred in and of themselves. No, he couldn't just appoint himself counsel, Mr. Russo, you are correct. But the point is not who technically represents the client under California law. The point is for purposes of tolling as opposed to for purposes of the existence of an attorney-client relationship. Looking at whether or not a reasonable person or entity, if you will, in the client's position would expect that further services will be provided. And also. Because if that is true, then they're told. Pardon me? Because if it is true that a person could reasonably expect continued representation, then they were told to run a statute of the right. Not that person, but a reasonable person in that person's position. In other words, it's a reasonableness standard. Correct. I'm saying if they were reasonable, as you suggested, whoever prescribed the payment, that they were told to run a statute. But under California law, case authority equates, and there's nothing to contradict this, equates being told, we will not represent you with actual knowledge that the representation has ended. And overarching this reasonableness standard is the purpose of the continuous representation tolling provision once the client discovers negligence or malpractice. What's that going to be using? The purpose is to prevent the disadvantaged client from being duped by the attorney so that the attorney can run out of his pension. The cases, every case that addresses this purpose recognizes when tolling, when the purpose for the rule ends, tolling ends. And here what we have less than one year, certainly before the critical date, we have a pair of you accusing Heller of malpractice. We have Heller saying, I'm out of here. You let me know if you consent. We have a pair of you saying, well, sure, for price, you bet. Give us back everything we paid you over the last six years or so, and get back all this talk we took even longer ago than now that we bought. Sure. As Judge Montelli so aptly put it, the holding hostage email. We have that. We have Michael Ackerman on the 10th, July 10th, coming to a hearing with Lauren Barkow, who has appointed herself CEO, effective immediately. And Ms. Ackerman advises the court, I am prepared to come in and represent a pair of you if Heller withdraws. And, of course, Heller has already announced his intention to withdraw. Now, under Hensley, which is one of the key critical appellate decisions here, the client became unhappy with the attorney, went to a new attorney and said, will you represent me? And that attorney said, no, I can't, not until your former attorney substitutes out. And the appellate court said, bingo, here's the date. It doesn't matter that all these formalities remained to be inked and the D's crossed and the I's dotted. That was the date you booked it. You, client, booked it. And it doesn't matter what your attorney thought, and it doesn't matter, it doesn't even matter after that, attorney number one, it would be defendant communicated with opposing counsel. And what if they continue to do work for the corporation as your opponent? Well, with respect to that, there is not one piece of evidence in the entire record that indicates, nor is there a citation to one I might have, that indicates that Heller, specifically attorney Fowle, or even anyone else for that matter, gave Ms. Barchow advice on how to make herself the CEO. That's just made up from hop hop. There's none. What about the July 13th hearing? There's a lot going on there. What do you have to say to that? The July 13th hearing, much like the hearings that preceded it, was a hearing at which Heller showed up, but the arguments that were advanced were advanced by Mr. Ackerman. Mr. Ackerman submitted a declaration. We have cited it in our brief, indicating that he was appearing for peer review at that hearing, number one. Also, Judge Gold, if I could ask you a question. Yes. The relationship between what a reasonable client would think about the representation and the particular conduct that your friend on the other side cited to us that Heller did in court. I'm not sure I understand the question. What is the action? What's the relationship, if any, between the conduct of what Heller did in court and what a reasonable client would think about the representation continued? The hallmark of continuous representation is an ongoing mutual relationship and activities in furtherance thereof. Heller went to that hearing, Heller, who had an obligation to assist with the transition, went to that hearing, and Michael Ackerman appeared for peer review. It's undisputed.  So, Heller shows up to assist with the transition. The reasonable client, who by now is Ms. Barkow, who has been accusing Heller of conspiring with Acuity to throw the whole lawsuit into Acuity's pocket, has Mr. Russo in the wings, Mr. Ackerman next to her, and has no reason whatsoever to believe that Heller is going to provide future services in no small part because Heller has told her so again and again, not simply because of her status, but because, as Heller puts it twice, there are no facts to justify interfering with Acuity's rights in this litigation. If that's what you want, you have to go find somebody else. And then last, we have Ms. Barkow not as the individual shareholder, but by Russo's express language, as the, quote, CEO and sole remaining director of peer review, unquote, consenting to withdraw as long as Heller pays the ransom. So, it's a nightmare. It's an absolute nightmare is what a reasonable person would view this as being. I guess here's my attorney that I've accused of conspiracy to his face. I've submitted declarations to the court accusing him of conspiracy, saying that he's malpracticed. I've demanded back all the money that's ever been paid. And, you know, I've got these other attorneys following me around to court hearings and filing their own motions from peer review. But, gee, I think Heller would just continue on as my counsel. It's mechanical. And it's not supported by a single case. And Ms. Barkow admitted in deposition, those are precisely the terms on which I was willing to let Heller out and consent to withdraw. So, no public policy that underlies any of the published California decisions is furthered by the results that peer review seeks here. Not a single one. In fact, it would make a mockery of the relationship. Okay, thank you. I see you haven't counted your time. You're over your time. I know I am. I apologize. Thank you. So, you're answering Jim Schill's question this time. So, let's give you two minutes for about a moment to hear what you have to say in response. Thank you, Your Honor. First, I would request that the court distinct the language of the statute here. This language of the statute isn't about what everyone was thinking or anyone given time. Those are all factors that play into whether or not representation was actually continuing. And the best evidence of whether or not a relationship was actually continuing is that services continue to be provided. Your Honor has just said that July 13th hearing, in fact, no services were really rendered. Yes, others showed up in kind of good form. But, in fact, the other lawyer that the doctor brought in is the person who made the argument or whatever. So, what do you have to say to that? Mr. Ackerman wasn't there on July 13th as counsel for peer review. He didn't become counsel for peer review until July 17th. He was there as counsel for Dr. Barkow individually, like Mr. Russo, in anticipation of becoming counsel for peer review. So, the record is clear that there's actually, in the person's record submitted by Howard Irwin, we see that there's a declaration from Mr. Ackerman. He talks about having been appointed as counsel, not substituted in by Judge McKinney on July 17th. He wasn't there as counsel. These sorts of informalities, I think these are important facts about determining exactly when attorney-client relationships can establish between these parties. And to go back to Judge Ruhle's point about, you know, what would the reasonable client under similar circumstances expect when an attorney appears in a hearing and says they're going to prepare a court order and then does prepare a court order, submits that to opposing counsel, gets their approval on it, and then submits it to the judge all after the fact, I think it would be very reasonable for a client to expect services to continue to be provided. And so you said there were two counsels. I've already mentioned to the court that the, and I would say that the one email that I pointed out, but that if you've got all of those together, and said you saw three, so you said there were two or three others that were more direct, how do you say that is a question of facts? The question is a matter of inferences, Your Honor, and I actually think this is where you, if the court doesn't find that the activities that took place after the critical date were sufficiently still on their own, and you're looking to what happened before the critical date, a lot of inferences have to be drawn about what these different communications mean. So, for example, the communications from Hillary Erdman we're talking about, and then the fight at 6th, Mr. Hawk, I think it was the one you were referring to, wrote a long email about how he cannot take instructions from Dr. Bargu. He can only take instructions from the CEO, and after which, when Dr. Bargu tried to appoint herself the CEO, Dr. Bargu did not effectively answer my text, and she had a very recent thing that, hey, I'm the CEO now, by his own email four days earlier, Mr. Hawk should now be taking my instructions, and now I can have Hillary Erdman on my side in this litigation. So I think that there are multiple inferences that can be drawn from those particular things, and it's against the rules of the jury judgment to make those inferences in favor of Hillary Erdman instead of the non-moving party, Bargu. Okay. Thank you very much, Kelsey. In case you're still talking, please submit it, and we are adjourned. Thank you. Thank you, guys.
judges: Gould, Watford, Sands